I would like to represent the appellate and I also should apologize for the case. The case is not so much about laws as it is about grades, school grades, and anything like that. This case needs prior study errors which shows that prior use of round pills increased the rate of stroke in that patient population from 1.73 per 100 to 2.49 and it was a good part of the statistical methodology that we didn't find. Exactly, and so what we are cautioning the authors there, caution, and the closing counsel correctly notes this, the authors there caution that even though they found that in their study they in fact found that round pill increased stroke, that future research and future studies may or may not be able to replicate that. In a way, the research is as if the scientists kind of didn't know whether it would work or didn't work or cause a problem or wouldn't cause a problem. Well, what they said is that in their study, and undoubtedly they measured that, they said their study was as if they were reaching into a can that they couldn't see a can full of colored ping-pong balls. They don't know what the colors of the ping-pong balls are. They reach in, they pull out one of the ping-pong balls, it's bright red. They caution, it causes stroke. But the authors there, they say, hey, we only pulled out one ping-pong ball. The can was full. Yes, sir. Yes. Yes. Yes, sir. Do you want to talk about the references? Tell us why they don't apparently disclose what's described in the references. Well, Ayer first said, Ayer says we did round pill to a certain group of patients, and in that certain group of patients, round pill in fact increased the rate of stroke. There's no dispute that hypertension is a risk factor for stroke. Correct. Correct. Are, have you identified any other things that you can do to prevent stroke? I mean, your claim is treatment or prevention of stroke. Aside from limiting or diminishing high blood pressure, what are the others? There's stop smoking, alcohol, obesity. But your claim would clearly cover reducing hypertension in order to reduce the risk of stroke, which is under your claim, which includes prevention of stroke. Yes. So you would read on the use of the same drug just for hypertension. In, in, in a, um, this drug before our scientists did their work, this drug was actually not used in patients who were at risk of stroke because hypertension has a risk, it causes a risk of heart attack, a risk of kidney failure, a risk of eye damage. There's lots of bad things that come about from hypertension. One of them, in addition to giving a high risk for stroke, and so what the physicians would do is if a patient came in that had hypertension and they were at risk of a heart attack but not really at risk of stroke, they were on a smoker, for example, the physician would give them Remicrol. If the patient was, if the physician thought the patient was at risk of stroke, they would not give them Remicrol, they'd give them a diuretic or a data blocker. So your invention would not cover the administration of this drug for hypertension because even though it's a risk factor for stroke, it's a risk factor for stroke, that somehow is not included in the claim. That's, yeah, our, our claims, our claims require the patient to be diagnosed as at risk of stroke because those are the kinds of patients who were avoided, pointed that way. But that would include people, let that be acknowledged, that that would include people who are at risk of stroke. Well, hypertension is one of the risk factors. Right, so include them, it's one, maybe not the only one, but it's one of them. Yes, yes. Would it, would it not include people who are taking the drug to reduce hypertension because that's a risk factor for stroke? That, that, apparently the physicians back before this, before these inventors published the work, physicians would, not based on hypertension alone, they would use the patient's weight, but there are, you know, a number of descriptions of what happened. I think the question was, would the medicine be essential for hypertension to be applied? If it were for a patient who was diagnosed at risk of stroke, yes. Well, doesn't Prampton do exactly that? In truth, it doesn't, it, forget whether it's a stroke or not, but it's used, Ravprobe, it's used to treat hypertension. Ravprobe? Yes, and Ravprobe says that Ravprobe is, Ravprobe summarized there, Ravprobe says, or I'm sorry, Prampton says Ravprobe is used to treat hypertension, to in fact reduce the all-over risk of death from any cause of stroke. However, what Prampton doesn't say is that Ravprobe reduces the risk of stroke. Well, that's what he's got, and that's why he's involved in the hypertension plan. Well, this is the, Prampton simply is summarizing the error, and Prampton says the AFRE study, well, I think that a little different, uses Ravprobe to treat hypertension. Yes, yes. Well, that's exactly what I thought you acknowledged, that it's a piece of your claim to Congress which is using Ravprobe to treat hypertension because that has an increased risk of stroke. You mentioned there's smokers and other people that are treated, but that would at least be one group of takers of Ravprobe that you say we acknowledge would be covered by your claim, right? Yes. Isn't that a problem? The… Neither Prampton nor Ayer appear to have given a recommended use of Ravprobe for patients that were identified as being at risk of stroke. Ayer showed an increase. Oh, yes. Yes. Most would question the availability of the plants. Exactly. I'm not sure whether it's in the record or not. I'll let the appendix say 24. Is this drug approved for prevention of stroke? Yes, I believe it is now. One, I'm not clear, maybe this is a legal question, but why do you need prior reference for stroke? I mean, you've got the Paracon case and various other cases, and they are sunscreen, and you used it before. You didn't necessarily… The result was that now we use it to prevent sunburn, and we said that's a problem. If prior I recognized that Ravprobe was useful or used Ravprobe to treat hypertension, and you acknowledge that hypertension is one of several things that you will treat in order to increase the risk of stroke, in other words, that's precisely within your claim, I'm not sure why, at least in the absence of excluding the use of hypertension, you can survive an irritant. Because in the sense of patients that have hypertension, some of them are physicians saying, you're at high risk of stroke. You know, there's a set of patients that have hypertension. Many of them are not really at that… that stroke is some risk, but they're not really going to elevate the risk of kidney failure or a heart attack. And for those patients, the physicians say, take one of this class of drugs. In that same set of hypertensive patients, there is a subset that is particularly at risk of stroke. Smokers, for example. And for a smoker, the physicians say, because you don't just have hypertension, you also smoke, you have very high danger of getting a stroke. Therefore, I'm not going to give you one of these drugs. Well, basically, it's a factual issue, but I thought the point was found, and I thought you could see it in the first question, that hypertension is recognized and you would agree is a risk factor for stroke. Are you now saying that hypertension is only a risk factor for smokers, but not for non-smokers? Hypertension is one of the risk factors for stroke. If you look at the… In fact, being alive is a risk factor for stroke. The four of us sitting here today, if we don't have hypertension, I could drop dead with a stroke right now. So you're scared you're hypercarbohydrate? Well, no, because we're not… The doctor didn't say, Mr. Holm, you're at risk of stroke. So having not been sort of pointed out as having that… Well, what about health? How is health different from this? You say they hadn't done the clinical trials, but you hadn't done the clinical trials, and you weren't going to find a problem, correct? Yes, and health is a very good idea. What Hope did… Well, why is this different in any way from Hope? Because they contemplated doing clinical trials, but they contemplated doing clinical trials. Exactly, exactly. So why is it exactly the same? Couldn't the Hope people have gotten better based on the prior heart reference this year? Couldn't they have gotten better just as you could have? Yes, they could have. How could it not be anticipatory if they, based on that reference, could have gotten better for the same thing? Because what… Remember our can of colored ping-pong balls in there. Hope is saying, hey, I'll only reach in once and pull that one red ping-pong ball. We don't think that's… Is it not fair to answer that Hope didn't disclose anything about a plan, didn't disclose any activity that is inherently inferior to stroke? Yes, yes. And this is a further answer that a different story to have a constructive reduction in practice doesn't mean we'll soon get it back? Yes. Okay. If you want to say something, it's fine. If you want to stay 10 minutes, actually, you can continue to talk or say whatever. Thank you very much. You're welcome. Thank you, Your Honor. May I speak to Corey? I think it's clear at this point that when we're explaining the comfort of administering rainbow krill to patients who were diagnosed in need of the treatment or prevention of stroke and that rainbow krill was, in fact, administered to patients with hypertension, which is a risk factor for stroke. So those patients were, in fact, diagnosed in need of such treatment. And that treatment went into those patients inherently anticipatory. Is there any necessity in need of stroke prevention? Well, at least, at an absolute minimum, the patients are supposed to be. Doctors don't prescribe based on trust, based on casual possibilities. That's correct, Your Honor. These aren't necessarily... There isn't a description of the treatment patients with stroke are likely to suffer from. Well, actually, one of the factors for allowing people into the Hope Study was that the patients had suffered previous strokes. We're talking about inherency here, not anticipation. That's correct, Your Honor. But the Hope Study did, in fact, designate that some of the 9,541 patients that it selected were selected because they previously had a stroke. And all of those patients were given at least 7 to 10 days worth of landfill during the run-in phase of the study. What was that determined tolerance and prevalence of the treats? It wasn't determined tolerance, but Hope further states that all 9,541 patients had been randomized as of the date it was published. And at randomization, all those patients started taking the random protesters. They were given that at their... To prevent stroke, tolerance of the drug. To prevent stroke. And as of the time that Hope was published, the study had been underway for at least a month for all 9,541 patients. And I think it's somewhat clear from Hope that not all of them started in January before the article was published. Some of them had started months before. So some of them had been given possibly directly. All of them had been getting the drug to determine poor treating stroke for at least one month as of the time that Hope was published. And where is that state in the world that pays for treating stroke? If that's true, then how many... Inherency. Inherency. Well, they... To be clear, they hadn't randomized that it was effective for doing that yet. So it's not clear as of the time that this first Hope publication was published that it was enabled for doing that because they didn't know whether or not the later Hope publication, which we referred to in our brief, indicates what the result was. The result was that random pill is effective. It's not a prior art, but as this course physician, Ernesto Myers said, for determining enablement, we look at the reference that is not prior art to show whether a prior art reference was effective. They're not citing subsequent Hope reference for enabling purposes. They're citing it as description of the invention or at least for inherency purposes. We're showing that it did, in fact, work and, therefore, that when Hope was administered, when Hope patients were administered the drug for the period they were inherently being treated, admittedly, the Hope study providers were not aware when they were doing the drug that it would be effective. So, I'm just wondering, in the capillary, our court says an invitation to investigate is not an appearance of coercion. That's correct. You did not, at the time, the other side filed this application. There had been no conclusions reached that the two-week investigation didn't remain, at least at that time, simply an invitation to investigate. Well, with respect, I don't think it was an invitation to investigate. It was saying, we are investigating. Our investigation has begun. We'll tell you our results in a few years and that's what this court's decision was in Bristol-Myers and it was in Verschkrauze. That is, in fact, inherently anticipatory. Even if you don't recognize the result at the time that you're making the disclosure, you are declaring to the world that you are doing this for this purpose and we'll let you know if it works. If it does work, in fact, then it will be inherently anticipatory. Did Montgomery himself have any say in the application? No, no, no. He was supposed to disclose specifically to the jury. If there are no further questions, I'll see you in a little bit. All right. Mr. Sloan, would you like to go to the microphone? Just to be clear, Montgomery does have a lot of studies in the application, both in the New York and Petro, in the lab and also in the meetings. Well, you said they had an approved indication. Yes. So, necessarily, they must have had a study. Yes. And the whole idea of the approval came after the application. The approval came after the application and about two and a half, three years after the examiner raised this whole question in the Naval Group and said, I don't think the intervention works. And he went back. Had they completed the studies at the time of Montgomery's application? About three years ago, yes. I believe the studies were completed by then. Or did the application say the studies had been completed? No, yeah. The studies were not completed by the time we filed our priority file. The studies were completed at the time we were going to file the No. 132 declaration and all that. Is it correct that clinical studies are rarely completed by the time we file an application? The examination is almost never because we have to, the Supreme Court says, we have to file our application when we have the concrete idea. Well, correct, but then it becomes difficult for me to distinguish hope on the part of the patient who completed their studies and completed their own studies by the time. Hope had no idea that their studies were, which way their studies were going to go. They say, we're going to check for whether we prevent or explore stroke, heart attack, they have it at a laundry list of 14 different things. Depression, the hostile behavior was one of the things they were going to look for. If you give a person round-the-clock, so they become more or less hostile, they had no idea how many of these things would come up. Our inventors, in contrast, kind of went down and actually looked at the cellular mechanism of how these drugs work in a patient's cells. And they said, we've done a little bit of clinical studies, based on this understanding of the cellular mechanism that produces a fair amount of components that will have a good result in the end. The difference is, the whole group of our inventors, in fact, had a very similar idea. It's just co-proposed data. So, for years long... So, you basically agree with the fact that co-proposed studies doesn't distinguish between co-proposed applications? I'm not sure I understand the question. You would agree that you can't distinguish between co-proposed and non-co-proposed applications in terms of planned studies, co-planned studies that have been completed? Correct. Well, we had an albeit small human trial that was completed and that was included in our application. That's not all of our data, but we included data from the 2000... But co-planned studies that have been completed. Correct, correct. Isn't your answer also that there's a difference between the requirements for an anticipatory reference and the requirements for a constructive reduction practice? Yes. An anticipatory reference has to allow you to enable constructive reduction practice. It is something that... Anything further? No, thank you. Any other questions? Good. Thanks for your time.